Filed 3/4/13  P. v. Lu CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES CHE MING LU,<br><br>Defendant and Appellant. | B236609<br><br>(Los Angeles County<br>Super. Ct. No. GA077455) |

APPEAL from a judgment of the Superior Court of Los Angeles County,

Clifford L. Klein, Judge.  Modified, and as modified, affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant

and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and

Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant James Che Ming Lu (defendant) guilty of the premeditated, deliberate and willful first degree murder of his wife and the attempted murder of his stepson. Defendant contends on appeal that there was insufficient evidence to support the premeditation finding; that the jury was misinstructed on provocation; and that the trial court abused its discretion when it dismissed a sitting juror. We reject these contentions, but we modify the judgment to correct a sentencing error. We affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual background.

#### A. *Prosecution Case*

Defendant married Michelle Lu (Lu) in 2002. Defendant was much older, 85, and Lu was in her 50's. Although defendant was retired, Lu had a housekeeping and childcare job that required her to be at work six days a week. Lu therefore slept at their home in Pasadena only Saturday nights, returning to work Sunday.[1] She did the cooking, cleaning, and shopping for the family, and, when she was home, defendant "bossed" her around. Although defendant and Lu shared a bedroom, he often slept in the basement until 1:00 or 2:00 a.m. in the summer.

In June 2009, Ji Zeng, Lu's adult son, came from China and lived with defendant and his mother. He had his own bedroom, separated from defendant's and Lu's

---

[1]     Defendant had lived in the house with his first wife, and they raised their children there.

bedroom by a bathroom. Zeng and defendant didn't talk much, but the first week that Zeng lived with his mother and defendant everything was fine. Problems arose, however, when the new bed Lu bought for Zeng broke. Lu's failure to ask defendant's friend to repair it angered defendant. After that, defendant would hang up on Lu when she called home. Defendant stopped eating with Lu and Zeng, and he engaged only in simple greetings. Once, when Lu came home, Zeng overheard her sobbing and defendant talking loudly. Lu told her son that defendant wanted a divorce and he would pay her money.

On Saturday, July 25, 2009, Zeng and Lu went to a friend's house in the afternoon, returning home around 9:00 p.m. After eating, they called Zeng's fiancée and then went to their rooms around 10:00 p.m. Zeng stayed up until about midnight. By the time Zeng went to bed, defendant had not come up from the basement. At some point, Zeng heard defendant come upstairs—he could tell it was defendant by the shuffling noise he made when he walked.

Zeng heard the door to Lu's and defendant's bedroom open. Seconds later, he heard a muffled sound and then a squeaky one. Before these sounds, Zeng did not hear any arguing or other commotion. After a short period of quiet, Zeng's door opened and he heard footsteps approach his bed. Looking up, Zeng saw defendant holding an axe with two hands above his head. Zeng threw his blanket at defendant, who twice tried to hit Zeng with the axe. He missed, and Zeng grabbed the axe. They struggled violently for control of it, and when Zeng, with one hand, reached for his cell phone to call 911, he heard defendant's teeth snap in an attempt to bite him. Zeng finally gained control of

3

the axe. Holding it, he ran from the house to defendant's goddaughter's nearby house, where he called 911. He told the responding officer, " 'My mother's inside. Please help her.' "

Deputy Sheriff Mayra Sotomayor and her partner were the first to arrive at the house. When the deputy approached the door, defendant came out and, in response to her question who else was in the house, he said, " 'My wife is in the bedroom.' "

The investigating officer, Detective Richard Ramirez, arrived at the house around 1:00 a.m. He saw no signs of a struggle in defendant's and Lu's bedroom, where Lu's body was on the bed. There were signs of a struggle in Zeng's room, where the comforter was partially on the floor and a speaker was knocked over. The only large collection of blood was under Lu's head. No weapons or a wood dowel were found in Lu's bedroom, and there was nothing in her hands.

Deputy Sheriff Raymond Poon also arrived at the house around 1:00 a.m. Defendant stood on the front porch, without a wheelchair or other walking aid. In English, he said, " 'I did it. I'm the one who called you. I will cooperate. I will tell you everything.' " Defendant repeated that he did it, and he said he and his wife had argued that day and " '[s]he said she wanted to leave me because she said her son is here already.' " Smelling soap on defendant, Deputy Poon asked if defendant had showered. Defendant said he had showered and changed his clothes because it was not " 'nice to meet the police [in] pajamas.' "

At the police station, detectives interviewed defendant, who did not complain of pain or say he needed to stop the interview. He was coherent throughout the recorded

4

interview.[2] He told the interviewing detectives that he and his wife argued that night. Lu wanted to leave him because she wanted her son, not her husband. This made defendant angry, but he was also angry about other things; for example, he had to do all of the housework and cooking and he was afraid they would get audited because Lu didn't pay taxes on the money she earned. Lu also complained that defendant never gave her money, but he gave her $80,000.

Defendant said that Lu tried to hit him but missed. When she tried to hit him, he picked up an axe he kept next to the closet for protection and struck her in the face. He struck her again as she was lying in bed. Defendant went to Zeng's room, and when Zeng saw him with the axe, he struggled with defendant for it, hitting defendant's back in the struggle. Defendant then called 911, "Because I did it. I killed my wife. I ought to call you guys."[3]

Dr. Pedro Ortiz, a deputy medical examiner from the Los Angeles County Department of Coroner, autopsied Lu's body. She had 11 distinct sharp force injuries or chop wounds[4] and 8 blunt force injuries. Three of her wounds were fatal: one to her right forehead, one to her left forehead, and one over her right temple, all of which caused multiple skull fractures. She also had one potentially fatal injury to her left lower jaw that produced multiple fractures. Her hand had a wound that was possibly a

---

**2**      The statement was played for the jury.

**3**      The 911 call was also played for the jury. Defendant said in the call, "I kill people," and that he and his wife argued.

**4**      By " 'chopping' " wounds the coroner meant that the inflicting instrument was heavy and sharp.

5

defensive wound.  Lu died as a result of multiple sharp force and blunt force trauma to the head and body.

Michelle Madrid, a criminalist, examined the crime scene.  The majority of blood was on the bed, around the head and body.  No other pool of blood was found in that bedroom or elsewhere in the house.  The majority of bloodstains were to the wall area and curtains above the victim's head.  Small blood stains were on the floor at the end of the bed, a mirror along the wall, a tissue box near the bedside, and the headboard.  There were no bloodstains on the soles of Lu's feet, but there were a few on the top of her feet.  A pair of men's pajamas, bloodstained in the center and upper arms, were on the bed.  There was also blood on the exterior doorknob leading to Zeng's room and on his comforter.  All three bathroom sinks tested positive for blood.  There was water in the bathroom tub of the basement and the soap appeared to be wet.

Zeng never saw a hatchet or axe anywhere in the house before that night.  Defendant did not come to his room that night and tell him he'd " 'hurt [Zeng's] mother.' "

B.    *Defense case.*

Defendant testified.[5]  Born in China, defendant immigrated to the United States in 1961.  His first wife died in 1997, and they had three sons together.  Before retiring, defendant worked as a wood carver.  He married Lu four months after meeting her, and he agreed to marry her so she could stay in the United States.  Because of safety

---

[5]    At the time of trial, defendant was 87 years old, using an oxygen tank, and in a wheelchair.

6

concerns, defendant kept an axe in the bedroom. Zeng was out of the house six days out of the week, and defendant cooked for himself.

Zeng and defendant got along. When Zeng's bed broke, defendant gave him the tools to fix it. A repairman ultimately fixed the bed, which was fine with defendant. There was no argument about the bed.

Defendant and Lu did, however, argue about money, with Lu accusing defendant of not giving enough money to her. When Lu said she only wanted her son, defendant said they should get divorced. Lu wouldn't agree to a divorce because she didn't want to lose defendant's benefits. It was defendant's understanding that if he died, Lu would get his property, but if they divorced she would get half. Lu asked defendant, " 'Why don't you just die[,]' " since he was at such an " 'advance[d] age.' " She told him that after he died she and her son would live on the income from defendant's rental properties. Defendant was afraid that Lu and Zeng would harm him.

In keeping with his habit, defendant went to bed in the bedroom at 8:00 p.m. that Saturday night. He did not sleep in the basement. Around 10:00 or 11:00 p.m., Lu came into the room and started to talk about money, accusing him of not giving any to her. Defendant listed everything he gave her. Lu got the wood dowel defendant used to keep the kitchen window shut and hit defendant's back with it. She continued to hit defendant, who used his hands to block the blows. When she stopped hitting him, they argued about money again for 15 to 20 minutes. At one point she said that if he kept talking she would " 'kill [him] with a knife.' " She went to the kitchen and defendant could hear her get a knife. Lu returned to the bedroom. Afraid, defendant picked up the

7

axe to defend himself. When he turned his body with the axe in his hand, Lu "pounced" on him. "[D]azed and confused," defendant hit her with the axe or, as she "pounced" on him, the two of them "collided" while he held the axe. Defendant could not remember what happened after that. The next thing he remembered was seeing Lu, who looked dead. He turned on the light, and because her eyes were open, he closed them.

Not realizing he was still holding the axe, defendant went to Zeng's room to tell him Lu was dead and to ask what they should do. Calling out Zeng's name to wake him, defendant said he'd argued with Lu and told him she was dead. When Zeng saw the axe, he tried to grab it, and he and defendant struggled over it. Defendant never intended to hit Zeng with the axe. Afraid that Zeng would hit him, defendant fled from the house. After hiding, he returned to the house, locked the door, and called 911. Although he changed his clothes, he did not shower or wash up, and he did not use soap because he was allergic to it.

During the interview with police, he did not ask how long he would be incarcerated. Instead, he said, " 'She [(Lu)] [said] I won't have too many years to muddle along.' "[6]

Defendant's son from his first marriage, Conrad Lu, a doctor, testified that in 1993, defendant had a massive heart attack, which required open heart surgery. A couple of weeks before July 26, 2009, Conrad told his father he could live with him, but defendant said he was more comfortable in his own house. Because Alice Wong,

---

[6]     A Chinese interpreter testified this is what defendant said.

defendant's goddaughter, told Conrad that defendant seemed depressed, Conrad went to see his father the night Lu was killed. Lu and her son were not there at the time.

Defendant was admitted to the hospital with severe chest pains on July 26, 2009, after he was arrested and interviewed. Photographs of him in the hospital showed bruising.

Dr. Stephen Read specializes in Geriatrics Psychiatry. He reviewed the police reports, coroner's report, taped interviews, and photographs, and he personally interviewed defendant. He diagnosed defendant with two conditions. First, defendant had "intermediate step of vascular brain damage" caused by his earlier heart attack. It was not a "dementing condition" or "that serious," but it impaired defendant's ability to think through and reason, a condition called mild cognitive impairment or cognitive disorder. Second, defendant had "a version of depression, which is abetted by this kind of vascular brain damage." Defendant's failure to grieve the death of his first wife contributed to his condition and shaped his response to and perception of what happened to him.

There is also such a thing as a person acting on "automatic pilot" or in an automatic manner. It's a phenomenon where people act in complex ways without really intending to; for example, some September 11 survivors reported acting in a similar way. When this happens, people may recall things in an incomplete or fragmentary way. People feel like they've "woken up at the end and know that something has happened, but have no memory or consciousness of their having done whatever it turned out they did."

9

## II. Procedural background.

On November 22, 2010, a first jury deadlocked. On July 27, 2011, a second jury found defendant guilty of count 1, the first degree murder of Lu (Pen. Code, § 187, subd. (a))[7] and of count 2, the willful, deliberate and premeditated attempted murder of Zeng (§§ 187, subd. (a), 664). As to both counts, the jury found true personal weapon-use allegations (§ 12022, subd. (b)(1)).

On October 7, 2011, the trial court sentenced defendant, on count 1, to 25 years to life plus a consecutive one-year term for the weapon enhancement. The court sentenced him, on count 2, to a concurrent "15-years-to-life" plus one year for the weapon enhancement.

## *DISCUSSION*

## I. There was sufficient evidence to support the finding that the murder and attempted murder were premeditated, deliberate and willful.

Defendant contends there is insufficient evidence to support the jury's finding that the murder of Lu and attempted murder of Zeng were premeditated, deliberate and willful.[8] We disagree.

"Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation . . . . Settled principles of appellate review require us to

---

[7] All further undesignated statutory references are to the Penal Code.

[8] Defendant concedes there is sufficient evidence of second degree murder.

10

review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. [Citations.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124; see also *People v. Snow* (2003) 30 Cal.4th 43, 66; *Jackson v. Virgina* (1979) 443 U.S. 307, 317-320.) "We draw all reasonable inferences in support of the judgment. [Citation.]" (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.) " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

A murder that is premeditated and deliberate is murder of the first degree. (§ 189; *People v. Burney* (2009) 47 Cal.4th 203, 235.) " ' " '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' " (*Burney,* at p. 235; see also *People v. Jurado* (2006) 38 Cal.4th 72, 118.) An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection, rather than an unconsidered or rash impulse. (*Burney*, at p. 235.) The process of premeditation and deliberation does not

11

require any extended period of time; rather, the " ' "true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . . " [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Three basic, but not exhaustive, categories of evidence will sustain a finding of premeditation and deliberation: (1) motive; (2) planning activity; and (3) manner of killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27; *People v. Burney, supra*, 47 Cal.4th at p. 235; *People v. Halvorsen, supra*, 42 Cal.4th at p. 420; *People v. Perez, supra*, 2 Cal.4th at p. 1125.) All three factors need not be present to sustain a finding of premeditation and deliberation. (*People v. Pride* (1992) 3 Cal.4th 195, 247.) Rather, "[a] first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner." (*People v. Romero* (2008) 44 Cal.4th 386, 400-401.)

There was evidence of all three factors in this case. First, there was evidence that defendant had a motive to kill Lu and Zeng. Defendant and his wife had been arguing, primarily over money. According to Zeng, defendant had asked Lu for a divorce, which she didn't want. Zeng also testified that defendant threw a "temper tantrum" when the bed broke. In the week preceding Lu's murder, defendant hung up the phone when Lu called and refused to eat with the family or to engage in conversation other than simple greetings. Even defendant testified that he and Lu had problems and argued over money and her failure to pay taxes, although he characterized Lu as the one with the temper. Defendant also said that it was Lu who asked for a divorce, because she only

wanted her son. Thus, defendant's own story provided a motive for killing Lu and Zeng—anger over Lu's threats to leave him, citing her son as the reason. (See *People v. Bloyd* (1987) 43 Cal.3d 333, 342, 348 [evidence that the defendant and victim argued before the murder was sufficient to support a finding that anger motivated defendant to kill]; *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 [observing that the law does not require a " 'rational' " motive for murder; even anger, however " 'shallow and distorted,' " at the way the victim spoke to the defendant may be a motive for murder].)

Second, there was evidence defendant planned to kill Lu and Zeng. He stayed downstairs in the basement until Lu and Zeng had gone to bed, coming up sometime after midnight. Zeng also never saw an axe in defendant's and Lu's bedroom, contrary to defendant's testimony he kept an axe in the room for safety. The jury therefore could have reasonably inferred that defendant brought the axe with him into the bedroom, planning to use it to kill Lu and then Zeng. (See, e.g., *People v. Wharton* (1991) 53 Cal.3d 522, 547 [evidence that the likely murder weapon, a hammer, was placed near the scene of murder suggested planning activity].)

Finally, the manner of killing showed premeditation. Lu was found in bed, dead from multiple blows from the axe. According to Zeng, his mother had gone to bed around 10:00 p.m., and the murder took place around midnight. Lu had only one wound to her hand that the coroner described as possibly a defensive wound. There was no sign of a struggle in the bedroom. Zeng did not hear any arguing or a commotion. The main collection of blood was on the bed, under Lu's head and upper body. There were no weapons, such as a wood dowel or a knife, found in the bedroom. From this

13

evidence, the jury could have inferred that defendant killed Lu, or at least struck the first blow, while she was asleep, thereby supporting the conclusion that her murder was deliberate rather than spontaneous. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 956-957 [execution style killing and no evidence of a struggle supported conclusion that murder was premeditated and deliberate rather than impulsive], disapproved on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110; *People v. Bloyd, supra,* 43 Cal.3d at p. 348 [point blank shot to the back of the head of one victim and close-range shot to another victim showed premeditation and deliberation].) Similarly, there was evidence that defendant tried to kill Zeng while he slept: defendant went into Zeng's room with the axe. Zeng heard someone come into his room and opened his eyes to find defendant standing over his bed, axe held in two hands ready to strike.

Based on this, there was sufficient evidence to support the jury's finding that the murder and attempted murder were premeditated, deliberate and willful.

## II.    The jury was not misinstructed on provocation.

Defendant contends that CALCRIM Nos. 522 and 570 misled the jury as to how they should evaluate evidence of the provocation necessary to negate premeditation and deliberation, thereby denying him his due process rights. We disagree.

A challenge to jury instructions as being incorrect or incomplete requires us to evaluate the instructions given as a whole, not in isolation, to determine whether there is a reasonable likelihood they confused or misled the jury and thereby denied the defendant a fair trial. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 182; *People v. Richardson* (2008) 43 Cal.4th 959, 1028; *People v. Hernandez* (2010) 183 Cal.App.4th

14

1327, 1332.) We presume jurors are intelligent and capable of understanding and correlating jury instructions. (*Richardson*, at p. 1028; *People v. Carey* (2007) 41 Cal.4th 109, 130.)

"First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation." (*People v. Hernandez, supra,* 183 Cal.App.4th at p. 1332.) Second degree murder is an unlawful killing, but without premeditation and deliberation. (*Ibid.*) First degree murder thus may be reduced to second degree where there is evidence the defendant formed an intent to kill in direct response to provocation and acted immediately. (*People v. Wickersham* (1983) 32 Cal.3d 307, 329, disapproved on another ground by *People v. Barton* (1995) 12 Cal.4th 186, 200-201; see also *People v. Valentine* (1946) 28 Cal.2d 121, 132 [provocation that is insufficient to reduce a murder to manslaughter may nevertheless raise a reasonable doubt that the defendant formed an intent to kill, thereby reducing the degree of murder to second].) "The issue is whether the provocation precluded the defendant from deliberating. [Citation.] This requires a determination of the defendant's subjective state." (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295; see also *Wickersham,* at p. 329 ["The fact that heated words were exchanged or a physical struggle took place between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt in the minds of the jurors regarding whether the accused planned the killing in advance"].) If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating and premeditating, the crime is second degree murder. (*Hernandez,* at p. 1332.)

Provocation thus operates in two ways. First, it can reduce first degree murder to second degree murder if the provocation prevented the defendant from subjectively premeditating. Second, it can reduce murder to manslaughter if a person of average disposition (an "objective" person) would have been provoked. The jury was therefore instructed with CALCRIM No. 522: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed a murder or manslaughter."[9]

The trial court also instructed the jury with CALCRIM No. 570: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] [o]ne, the defendant was provoked; [¶] [t]wo, as a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and, [¶] [t]hree, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion [that] cause[s] the person to act

---

[9] The jury here was instructed on first and second degree murder, voluntary manslaughter (heat of passion/sudden quarrel), and perfect and imperfect self-defense.

16

without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant [simply] was provoked. The defendant isn't allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts[,] would have reacted from passion rather than from judgment. [¶] If enough time has passed between the provocation and the killing . . . for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to a voluntary manslaughter on this basis."

Defendant contends that giving CALCRIM Nos. 522 and 570 together confused the jury and led them to apply an objective standard inappropriately when considering the degree of murder. Defendant does not, however, directly contend that either CALCRIM No. 522 or No. 570 misstate the law. He instead argues that giving them together in this case was misleading. But a trial court has no sua sponte duty to revise or to improve an accurate statement of law absent a request from counsel. (See, e.g., *People v. Lee* (2011) 51 Cal.4th 620, 638; *People v. Rogers* (2006) 39 Cal.4th 826, 877-880; *People v. Hernandez, supra,* 183 Cal.App.4th at p. 1333 [an instruction on provocation for second degree murder is a pinpoint instruction that need not be given

17

sua sponte by the trial court].)  By failing to request a pinpoint instruction, defendant forfeited the issue on appeal.

In any event, we reject the argument that the jury would have been misled by CALCRIM Nos. 522 and 570.  CALCRIM No. 522 expressly told the jury that provocation could reduce murder to manslaughter *or* reduce a murder from first to second degree.  CALCRIM No. 570, in contrast, clearly concerned only reducing murder to voluntary manslaughter.  The instruction begins, "A killing that would otherwise be *murder is reduced to voluntary manslaughter* if the defendant killed someone because of a sudden quarrel or in the heat of passion."  It goes on to state, "In order for heat of passion *to reduce a murder to voluntary manslaughter*, the defendant must have acted under the direct and immediate influence of provocation . . . . "  (Italics added.)  The reference to the "provocation" that would have caused a "person of average disposition" to act rashly and without due deliberation was therefore confined to the context of reducing murder to manslaughter.  The instruction does not refer to reducing first degree murder to second degree murder.

CALCRIM No. 521 addressed that issue.  It informed the jury that first degree murder differs from second degree murder in that the former requires a killing that is intentional, deliberate, and premeditated.  The instruction continues:  "A decision to kill made rashly, impulsively, [or] without careful consideration [is] not deliberate and premeditated."  CALCRIM No. 521 therefore instructed that provocation can reduce first degree murder to second degree murder by negating intent, deliberation and premeditation.  (*People v. Hernandez, supra,* 183 Cal.App.4th at p. 1334 ["Based on

18

CALCRIM No. 521, the jury was instructed that unless [the] defendant acted with premeditation and deliberation, he is guilty of second, not first, degree murder, and that a rash, impulsive decision to kill is not deliberate and premeditated"].)[10]

When CALCRIM Nos. 521, 522 and 570, are read together, it is reasonably clear that provocation can reduce a first degree murder to second degree, and that the objective "person of average disposition" applied to the separate question whether a murder can be reduced to manslaughter. Considering the instructions as a whole, it is not reasonably likely that the jury was misled into legal error.

Nor do we agree that the question the jury submitted suggests anything to the contrary. The jury asked, "In terms of 2nd degree murder, is it up to me, a juror, to decide whether or not possible provocation was simply present? Or whether the provocation justified the end result (many wounds to Mrs. Lu's face)?" The court instructed the jury, "These issues are for the jury to decide." The jury's question does not indicate what the jury was thinking regarding defendant's objective or subjective perceptions. Rather, at least the first question indicates that the jury was asking the basic question whether it was up to them to decide the presence of provocation.

Because we conclude that there was no instructional error, we also reject defendant's related contention that his trial counsel rendered ineffective assistance by failing to request a modification to CALCRIM No. 522. (See generally, *Strickland v.*

---

[10]     In *Hernandez*, the jury was instructed with CALCRIM Nos. 521 and 522 but not with No. 570 concerning voluntary manslaughter. Although the court noted that the absence of No. 570 bolstered its conclusion that the jury would not have rejected second degree murder merely based on a rejection of the evidence for manslaughter, *Hernandez* did not state that had No. 570 been given its conclusion would have been different.

*Washington* (1984) 466 U.S. 668; *People v. Holt* (1997) 15 Cal.4th 619, 703.)  As we have said, the instructions given as a whole were adequate.

Even if there was instructional error, it was harmless, whether we review the issue under *Chapman v. California* (1967) 386 U.S. 18 or *People v. Watson* (1956) 46 Cal.2d 818.  The evidence overwhelmingly showed that there was no provocation.  Contrary to defendant's story that Lu attacked him with a wood dowel or that she had a knife, no weapons were found in the bedroom.  There were no signs of a struggle in defendant's and Lu's bedroom.  Lu was found on the bed, and blood had collected under her head and upper body.  Other than small spatters of blood on or near the bed, there were no other large collections of blood.  Lu had no defensive wounds, other than a possible one to her hand.  Defendant also went to Zeng's room while still holding the axe.  Given this evidence, any error in failing to instruct the jury on the provocation necessary to reduce first degree murder to second degree was harmless.

**III.  The trial court did not abuse its discretion by dismissing Juror No. 3.**

The trial court dismissed a juror who commented on reasonable doubt. Defendant contends that the juror was dismissed without cause and that the dismissal violated his constitutional right to due process of law and to trial by an impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.)  We disagree.

A.     *Additional facts.*

During closing arguments and before the jury retired for deliberations, Juror No. 2 reported to the bailiff that at the conclusion of trial on Friday she was with Juror No. 3 in an elevator.  Juror No. 3 "suggested to [Juror No. 2] that she had already

20

formed an opinion or was very close to already forming an opinion." Juror No. 3 said something like, " 'Well, after today's testimony, we can see how reasonable doubt can be easily arrived at.' " No other juror was present when the comment was made.

The trial court, out of the presence of the other jurors, asked Juror No. 3 if she had commented on the case. She "could have" made a comment about reasonable doubt. She agreed that if she did, it could be "problematic" because she had been instructed not to discuss the case. Although she couldn't recall specifically what she said, "I do remember the tone of just that we both were sort of like, 'Oh, it's—you know, we've heard it all now, and a bit of relief, and that it was a very sort of surprising just as we talk about one doesn't know everything until you've heard everything." "So there was sort of that, 'Wow, it was sort of surprising to learn things.' " The juror said she did not make a judgment on reasonable doubt, but she did say something like she could see how there could be reasonable doubt. When the juror made her comment, she was not trying to intimate what she thought or influence the other juror.

Based on this, the prosecutor requested that Juror No. 3 be replaced with an alternate, but the defense objected. The trial court granted the motion to replace the juror: "I think there is enough evidence here based on what Juror No. 2 said. And she said something very close to that, so 'you can see how reasonable doubt can be easily arrived at after today's testimony.' She said it specifically according to him in the context of the testimony. And even in her own version, I think it was very close to that. And I just think she has failed to obey the admonition. She has discussed the case and expressed some opinion on it."

21

B.      *Juror No. 3's failure to follow the court's instructions constituted good cause for her dismissal.*

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [Citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty . . . the court may order the juror to be discharged . . . . " (§ 1089; see also *People v. Farnam* (2002) 28 Cal.4th 107, 140-141; *People v. Cleveland* (2001) 25 Cal.4th 466, 474.)

To remove a sitting juror, the juror's disqualification must appear on the record as a " ' "demonstrable reality." ' " (*People v. Farnam, supra,* 28 Cal.4th at p. 141; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052; *People v. Fuiava* (2012) 53 Cal.4th 622, 711.) "This standard 'indicates that a stronger evidentiary showing than mere substantial evidence is required to support a trial court's decision to discharge a sitting juror.' [Citation.]" (*Barnwell*, at p. 1052; see also *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71.) The demonstrable reality test is "more comprehensive and less deferential" than the substantial evidence standard. (*Barnwell*, at p. 1052.) "It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established. . . . [A] reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard,

22

however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Id.* at pp. 1052-1053; see also *Fuiava,* at p. 712.) The reviewing court must therefore consider the evidence and the record of reasons the trial court provided. (*Barnwell*, at p. 1053.)

A court may discharge a juror for good cause, which includes failing to follow the court's instructions. (*People v. Allen and Johnson, supra,* 53 Cal.4th at p. 69; § 1122, subd. (a)(1).) The jurors here were instructed not to talk about the case with anyone, including each other, "until the time comes for you to begin your deliberations." The jury was also told to "discuss this together only after all of the evidence has been presented, the attorneys have completed their arguments, and I have instructed you on the law. [¶] After I tell you to begin your deliberations, you may discuss the case only in the jury room, and only when all jurors are present." Despite these instructions, Juror No. 3 made a comment to Juror No. 2 about reasonable doubt. When the comment was made, the jurors were not yet deliberating, they were not in the jury room, and not all jurors were present. The juror therefore violated the court's instructions.

Even if, as defendant argues, Juror No. 3's comments were neutral and did not suggest a bias toward either side, disregarding the trial court's instruction to refrain from discussing the case can constitute, in the trial court's discretion, good cause to excuse the juror. (*People v. Daniels* (1991) 52 Cal.3d 815, 864-865.) It may be that had the trial court refused to dismiss Juror No. 3, that too would not have been an abuse of discretion. But where, as here, the juror indisputably commented, before

23

deliberations had even begun, on reasonable doubt in a way that might suggest her opinion of the case,[11] we cannot find that her dismissal was an abuse of discretion, even under the heightened standard of review.

## IV. The sentence must be modified.

The trial court sentenced defendant, on count 2 for attempted murder, to a concurrent "15-years-to-life" plus one year for the weapon enhancement. Premeditated and deliberate attempted murder is punishable, however, by life in prison with the possibility of parole. (§ 664, subd. (a).) The correct sentence on count 2 therefore should be life plus one year for the weapon-use enhancement under section 12022, subdivision (b)(1).

---

[11] We note that Juror No. 2 thought that Juror No. 3 was expressing an opinion. This belief certainly was a factor the trial court could consider in finding good cause to dismiss Juror No. 3.

## *DISPOSITION*

The judgment is modified to reflect that the correct sentence on count 2 is life with the possibility of parole plus one year under section 12022, subdivision (b)(1). The clerk of the superior court shall modify the abstract of judgment to reflect the correct sentence and forward the modified abstract of judgment to the Department of Corrections. The judgment is otherwise affirmed as modified.

## *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

CROSKEY, J.

WE CONCUR:

KLEIN, P. J.

KITCHING, J.

25